IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GGC ASSOCIATES, LLC,                    )
     Plaintiff,                         )
                                       )
                                       )
        v.                           )          Civil Action No. 3:17CV402
                                       )
W. CLAY HAMNER and                      )
BRIAN FAUVER,                           )
     Defendants.                        )
                                   )

## MEMORANDUM OPINION

This action for actual and constructive fraud arises from a failed commercial lease arrangement. On January 28, 2013, the plaintiff, GGC Associates, LLC ("GGC"), through the related entity Midtown Land Partners LLC ("Midtown"), entered into a lease with specialty grocery store Southern Season, Inc. ("Southern Season") for the operation of a store in a new commercial development in Richmond, Virginia. (Trial Ex. 1.) When Southern Season struggled to meet sales goals, its officers, defendants W. Clay Hamner ("Hamner") and Brian Fauver ("Fauver") (collectively, "Defendants"), sought concessions and financial assistance from both GGC and its parent company, Gumenick Properties. GGC alleges that, in seeking assistance, Hamner and Fauver fraudulently concealed that a letter of credit, serving as security deposit under the lease, lapsed when the servicing bank transferred its assets to a new bank. GGC claims Defendants' deliberate omission induced GGC and Gumenick Properties to make $150,000 in equity investments to keep Southern Season afloat. Southern Season shuttered its doors on April 24, 2016, paid the balance of the security deposit through a wire transfer, and filed for Chapter 11 Bankruptcy on June 24, 2016. (Trial Tr. 74:3–8, 267:12–14; Trial Ex. 23.)

GCC brings two counts against Defendants: actual fraud against Hamner (Count I), and constructive fraud against Hamner and Fauver (Count II). Defendants removed the action from state court on May 26, 2017, and the Court held a bench trial on March 20, 2018. On April 17, 2018, the parties submitted post-trial briefs including proposed findings of fact and conclusions of law. Pursuant to Federal Rule of Civil Procedure 52(a), the Court issues the following findings of fact and conclusions of law, incorporating by reference the parties' exhibits and the Court's record. Because GCC failed to prove several elements of actual or constructive fraud by clear and convincing evidence, the Court shall enter judgment for Defendants on Count I and Count II.

## I. FINDINGS OF FACT

In 2013, the parties began their business relationship. Hamner and Fauver were the CEO and CFO of Southern Season, respectively, and both are citizens of North Carolina. (Trial Tr. 187:1–5, 243:23–244:1, 244:23–24.) GCC is one of three subsidiaries of Gumenick Properties that play crucial roles in this business deal. (Trial Tr. 27:18–25.) Virginia is GGC's state of incorporation and primary place of business. On January 28, 2013, Southern Season and Midtown Land Partners, LLC ("Midtown"), the second Gumenick Properties subsidiary involved, entered into a lease agreement for commercial retail space in the Libbie Mill neighborhood of Richmond, VA. (Trial Tr. 28:7–29:11; Trial Ex. 1.)

The lease included a number of standard requirements and terms, including a proposed budget for the storefront construction and development benchmarks. (Trial Ex. 1.) Under Paragraph 33(a) of the lease, Southern Season had to provide $550,000 as a security deposit, satisfied by either cash or a letter of credit. (Trial Ex. 1.) Southern Season elected to use a letter of credit for the security deposit. (*See* Trial Ex. 5.)

2

The lease listed specific requirements if the lessee satisfied the security deposit requirement by a letter of credit. (*See* Trial Ex. 1 at ¶ 33(a).) The letter of credit had to be irrevocable and unconditional. (*Id.*) It had to remain in place for as long as Southern Season leased the space and could not expire until sixty (60) days after the lease terminated. (*Id.*) Moreover, the letter of credit had to be issued by a bank with counters in Richmond, Virginia. (*Id.*)

The letter of credit's terms remained unchanged even though the parties twice amended the lease. (*See* Trial Exs. 2, 3.) Midtown and Southern Season agreed to the first lease amendment in August 2013, mainly to further detail the budget and the development timeline. (Trial Ex. 2.) In the second amendment, executed in November 2013, Midtown assigned the lease to LM Retail, LLC ("LM Retail"), a third subsidiary of Gumenick Properties. (Trial Tr. 28:7–29:3; Trial Ex. 3.) Because CertusBank, N.A., ("CertusBank"), Southern Season's main bank, did not have banking counters in Richmond, as required by the lease, Southern Season and LM Retail drafted a third amendment in January 2014 to allow CertusBank to issue a letter of credit that would satisfy the lease's security deposit requirement. (*See* Trial Ex. 4.) LM Retail was willing to—and eventually did—accept a letter issued from CertusBank. (Trial Tr. 34:22–35:8.) However, the parties did not execute the proposed third amendment. (Trial Tr. 333:15–334:25; Trial Ex. 4.)

CertusBank issued a letter of credit to LM Retail on behalf of Southern Season on January 17, 2014. (Trial Tr. 34:20–35:8; Trial Ex. 5.) LM Retail accepted the letter as the security deposit for the lease. (Trial Tr. 34:25–35:2.) Paul Davenport, LM Retail's attorney, sent the letter of credit to LM Retail's loan officer at Union Bank, Rene Shepperson. (Trial Tr. 37:3–11, 336:25–337:19.) LM Retail also received a copy of the letter. (Trial Tr. 37:12–14,

3

337:20–338:1.)  The letter was valid only for a year and required renewal each year rather than being irrevocable, as the lease required.  (Trial Ex. 5.)  However, all parties understood it as an "evergreen" letter of credit that would automatically renew each year unless there was a notice of nonrenewal or termination.  (Trial Tr. 37:20–38:17, 232:24–233:2, 299:9–14, 336:16–20; Trial Exs. 8, 9.)  The parties all thought that an evergreen letter of credit was acceptable under the lease's irrevocability requirement.  (*See* Trial Tr. 85:5–9.)

On July 31, 2014, Southern Season officially opened its Richmond store.  (Trial Tr. 255:21–25.)  Three months later, on October 1, 2014, Southern Season first began to pay rent in accordance with the lease.  (Trial Tr. 38:18–20; 256:1–6.)  Rent was due on the first of the month, though Southern Season typically did not pay rent on time.  (Trial Tr. 39:2–11.)  While LM Retail could have drawn on the letter of credit if the rent went unpaid, the company never did because Southern Season paid rent within an acceptable time under the lease.  (Trial Tr. 39:12–40:1; Trial Ex. 1.)

By March 2015, Southern Season's financial woes became evident, prompting Hamner and Fauver to seek financial assistance from Gumenick Properties.  (Trial Ex. 55.)  On March 30, 2015, Hamner emailed Wayne Chasen ("Chasen"), the President and CEO of Gumenick Properties and a member of GGC, to suggest ways to financially assist Southern Season, including a partial "[r]elease [of the] letter of credit so we can use as our borrowing base."  (Trial Tr. 128:25–129:5, 199:3–6, 257:11–258:8, 264:2–17; Trial Exs. 55, 60.)  In an attempt to keep Southern Season in the rental space, LM Retail and Gumenick Properties negotiated with Southern Season about providing financial assistance.  (Trial Tr. 40:2–6, 373:6–10.)

Southern Season again signaled their troubling financial affairs when, on April 16, 2015, Fauver indicated to Jim Wilvert ("Wilvert"), the CFO of Gumenick Properties, that Southern

Season was having unanticipated difficulties building sales in Richmond. (Trial Tr. 27:13–21; Trial Ex. 14.) Several days later, Hamner emailed Chasen to discuss several options "to get over the hump," including: paying a percentage of the rent for the next two years, followed by paying the difference over the subsequent four years; releasing part of the letter of credit; or buying the remaining stock, which would be repaid with EB-5 funding. (Trial Tr. 266:13–17; Trial Ex. 15.) Over the next few days, between April 28th and April 30th, 2015, Hamner and Chasen discussed a potential equity contribution from GGC of $50,000 over five months without releasing the letter of credit. (Trial Tr. 151:9–22, 168:17–21, 258:9–21.) Chasen and Wilvert claimed that the letter of credit was important to ensure Southern Season did not default on its lease obligations to Midtown and so they refused to entertain a partial release of the letter of credit. (Trial Tr. 73:14–74:2, 183:21–184:6, 258:14–21.)

On July 20, 2015, Southern Season released its first quarter report to its investors. (Trial Exs. 44, 65). In the report, Southern Season claimed to have thirty-eight applicants for EB-5 funding, bringing it close to securing the funding. (*Id.*) The report also explained that while CertusBank was divesting its assets, the bank had not yet sold Southern Season's line of credit. (*Id.*) However, Southern Season needed CertusBank to maintain the loan until it could be paid off with EB-5 funding. (Trial Tr. 179:2–180:18; Trial Exs. 44, 65, 66.) The report also revealed the extent of the challenges facing the Southern Season Richmond store, as it would take three years to reach the original targets. (Trial Ex. 44.) After reading the report, Wilvert forwarded it to two board members of Gumenick Properties, Randy and Jeffrey Gumenick. (Trial Tr. 181:3–16, 347:15–24; Trial Ex. 66.) Jeffrey Gumenick is the chairman for Gumenick Properties, a member of both LM Retail and Midtown, and the managing member of GGC. (Trial Tr. 348:4–21.)

After Southern Season issued the report, in August 2015, Fauver resumed discussions on receiving financial assistance from Gumenick Properties. (Trial Ex. 54.) He sent an email to Chasen, Wilvert and Jeffrey Gumenick recommending reduced rental payments. (*Id.*) Later that month, Hamner also suggested that three board members purchase their revolving credit facility at a ten percent discount, as proposed by a representative at CertusBank.[1] (Trial Tr. 297:12–298:1; Trial Ex. 43.) There is no evidence in the record that board members purchased the loan.

In late August 2015, Wilvert proposed a $300,000 equity investment in Southern Season by Gumenick Properties, to be distributed in $25,000 monthly payments, subject to timely rent payment. (Trial Tr. 44:10–17; Trial Ex. 28.) Following this proposal, in August 2015 Southern Season took a $25,000 rent reduction rather than the equity contribution Gumenick Properties desired. (Trial Ex. 58.) Gumenick Properties classified this as an equity contribution in order to proceed with this agreement. (Trial Tr. 58:11–16.) Hamner requested that the $300,000 equity investment be in the form of a lump sum, but Wilvert emphasized that Gumenick Properties preferred to make smaller payments with the rent payment condition. (Trial Ex. 51.) At this point, Wilvert believed that Southern Season would receive EB-5 financing in September 2015. (Trial Ex. 28.) However, the company never received the EB-5 financing. (Trial Tr. 261:10–20.)

On September 10, 2015, Wilvert wrote to Hamner and Fauver to further discuss an equity contribution in Southern Season. (Trial Ex. 49.) Wilvert explained, "[i]f you wish to retain the maintenance of the parking lot then we are going to need to leave the [letter of credit] fully in place during the investment term and any future investment term. So the agreement would include a lease amendment to leave the deposit fully in place." (Trial Tr. 50:4–16; Trial Ex. 49.)

---

[1] A revolving credit facility, or a revolver loan, is when a bank grants a company a loan, and the company can borrow any amount up to the cap of the loan. (Trial Tr. 197:12–20.)

However, these terms were never agreed to or discussed further, nor were they part of the final proposed terms in the Letter Agreement. (*See* Trial Exs. 16, 17.) On September 15, 2015, Hamner, in his response to Wilvert, indicated that Southern Season's continued struggles with sales pushed Hamner and Fauver to consider closing the Richmond store and foregoing the equity investment if another tenant was willing to occupy the space. (Trial Ex. 52.) The next day, Jeffrey Gumenick wrote to Chasen and Wilvert that "losing our investment dollars in [Southern Season] will be a hardship, especially for me (losing family dollars vs. company)." (Trial Ex. 72.) He explained that one key purpose of the equity contribution agreement was to generate research "to explain the loss of the retailer to the real estate and retail community if and when they close." (Trial Tr. 370:23–371:1; Trial Ex. 72.)

On September 24, 2015, CertusBank sold Southern Season's loan to SummitBridge National Investments IV, LLC ("Summit"). (Trial Tr. 212:21–213:21, 278:6–8.) At the time, all parties believed that the letter of credit transferred with the loan purchased by Summit. (Trial Tr. 69:3–10, 278:8–12.) A CertusBank representative, David Beard, explained to Hamner and Fauver in late September that, while Summit bought the loan, all that changed was who received payments. (Trial Tr. 278:6–12.) Shortly after, Southern Season disclosed the sale of its revolver loan to Summit and CertusBank's closing to its investors in a report distributed on September 29, 2015. (Trial Tr. 72:2–21; Trial Exs. 37, 67.)

Distributed by Hamner on behalf of Southern Season to all LLC members and investors, including Fauver and Chasen, the report is mostly a financial review of Southern Season's performance over the first half of 2015 through August 2, 2015. (Trial Exs. 37, 67.) The report includes a power point presentation that details financial information and discusses new projects and plans for the company. (*See id.*) On the seventeenth page of the presentation, Southern

Season informed investors that "CertusBank, our former senior lender, has closed down all operations and our $4.3 million loan is now owned by Summit Investment Management, Denver, CO." (Trial Ex. 37.) As Gumenick Property's CFO, Wilvert read this report, including this information concerning the sale of the loan. (Trial Tr. 72:2–21.) As the one responsible for administering Southern Season's lease, including the letter of credit, Wilvert was in charge of conveying any issues or major changes, like the transfer of a loan, to both Chasen and Jeffrey Gumenick. (Trial Tr. 169:12–17, 349:8–13; Trial Ex. 67.) However, there is no evidence that Wilvert communicated any issues with the loan. He also did not object to this transfer to an out-of-state lender, even though Summit, like CertusBank, did not have banking counters in Richmond. (Trial Tr. 111:20–112:9.) GGC believed, based on Wilvert's knowledge, that the letter of credit did not lapse and remained viable when the loan was sold. (Trial Tr. 72:18–21.) Both GGC and the defendants assumed that Summit would honor the letter of credit. (Trial Tr. 87:19–88:12.)

On October 2, 2015, Wilvert sent an email to Hamner, Jeffrey Gumenick, Randy Gumenick, Chasen, Fauver, and Dave Herman with the final proposed terms for an equity contribution between GGC and Southern Season. (Trial Ex. 16.) Wilvert stated that this email "constitutes all the terms we agreed to yesterday. I invite everyone's comments today and tomorrow before I send to the attorney to draft." (Trial Tr. 104:19–105:14; Trial Ex. 16.) With no response to the terms, the agreement was drafted as Wilvert described in the email. (Trial Tr. 105:22–25.) Jeffrey Gumenick, in approving the equity investment, did not know about any additional terms other than those in the Letter Agreement and approved the agreement mainly to keep Southern Season afloat as a tenant. (Trial Tr. 350:7–25, 361:12–16, 362:8–12, 372:25–

373:10.) On October 21, 2015, both Chasen and Hamner signed the agreement (the "Letter Agreement") for GGC and Southern Season respectively. (Trial Ex. 17.)

The Letter Agreement included two major provisions. First, for each month Southern Season paid rent, taxes, insurance and other operating expenses, GGC would invest $25,000, the sum of which could not exceed $300,000. (*Id.*) GGC would also receive stock in the company in exchange for the equity investment. (*Id.*) Second, Southern Season and GGC agreed to have a consulting firm do market research and assess Southern Season's problems. (*Id.*) Importantly, the Letter Agreement did not discuss the letter of credit. (*Id.*) GGC paid a $25,000 contribution in January, February, April, May, and June of 2016 in accordance with the Letter Agreement. (Trial Tr. 58:11–18.) The total investment was $150,000, including the rent reduction. (Trial Tr. 58:19–22.)

Even though Southern Season and GGC made this Letter Agreement for an infusion of cash that came in 2016, Southern Season, just two months after signing the Letter Agreement, defaulted under its loan with Summit for failing to pay on the revolver loan by December 31, 2015. (Trial Tr. 237:15-238:8; Trial Ex. 31.) Due to Southern Season's default and continuing financial struggles, Hamner emailed Chasen, Jeffrey Gumenick, and Dave Herman in March 2016 and explained that Southern Season needed to "cut our expenses and losses" by either (a) reducing square footage with rent to be a portion of sales or (b) vacating the premises. (Trial Ex. 29.) By this time, Southern Season's financial troubles were clearly worsening.

As an "evergreen" letter of credit, the letter needed to be renewed on January 17, 2016. (*See* Trial Ex. 5.) The loan agreement with both CertusBank and Summit required Southern Season to pay an annual fee for a letter of credit, but Hamner did not recall Summit charging any fees for the letter. (Trial Tr. 292:1–11; Trial Exs. 5, 56 at 20–21.) As part of the transition to

Summit, Chris Warfford, the controller for Southern Season, signed a document dated March 30, 2016, that detailed Southern Season's revolving credit facility and line of credit with Summit. (Trial Ex. 38.) This document indicated that of the $5,000,000 loan, $4,450,000 was outstanding balance and $550,000 remained as available credit. (Trial Tr. 215:5–216:15; Trial Ex. 38.) Fauver and Hamner understood that the $550,000, designated as available, was actually bound by the letter of credit. (Trial Tr. 216:9–15; 242:14–16.) Up to this point, the defendants made no affirmative statement asserting the status of the letter of credit as either lapsed or still in place.

In late March 2016, the business relationship between Southern Season and GGC continued to erode. On March 29, 2016, Rene Shepperson ("Shepperson") emailed David Beard, her contact at CertusBank, to check on the letter of credit's status. (Trial Ex. 80.) The next day, Shepperson received an automatic failed delivery response due to CertusBank's closing. (Trial Tr. 62:12–63:21; Trial Ex. 80.) Shepperson forwarded the email to Wilvert and asked if he could ascertain if Southern Season still had the letter of credit. (Trial Ex 80.) Even though Wilvert knew that CertusBank no longer held Southern Season's loan after the purchase by Summit, Wilvert emailed Fauver stating, "[o]ur bank is trying to confirm the renewal of the letter of credit and sent me the email below. Can you shed any light on this?" (*Id.*) While he never received any notice from Summit, Wilvert, as an employee of LM Retail, the beneficiary of the letter of credit, could have contacted Summit at any time to check on the letter of credit. (Trial Tr. 84:24–85:4, 86:11–87:18.) Fauver responded with the contact information for Mark Kilcoin ("Kilcoin"), the representative from Summit. (Trial Ex. 30.) Fauver also told Wilvert that Summit purchased Southern Season's loan. (*Id.*) Rene Shepperson emailed Kilcoin asking if the letter of credit was still valid and whether Summit would still honor the letter. (Trial Ex. 80.) She also copied

Wilvert, who then forwarded the e-mail to Chasen. (*Id.*) Neither party received a response. (Trial Tr. 63:11–21.)

Days later, on April 4, 2016, Courtney Paulk ("Paulk"), representing LM Retail, sent a default notice to Southern Season stating that the letter of credit in LM Retail's possession was no longer valid due to CertusBank's closure. (Trial Ex. 19.) Paulk further intimated that while "the Letter of Credit may have been purchased/transferred to Summit Financial Management in Denver, Colorado . . . [the letter] as it may currently exist, fails to satisfy the condition [in the lease] that it be issued by a financial institution with banking counters located in the Richmond, Virginia metropolitan area." (*Id.*) Following this default notice, Hamner sent an email to Kilcoin, the Summit representative, informing him that Southern Season would fund the letter of credit "which lapsed when Certus closed." (Trial Ex. 57.) Hamner also never received a response from his email to Kilcoin. (Trial Tr. 283:22–25.) Later, Hamner admitted that he may have been mistaken about this lapse in the letter of credit due to his understanding of Paulk's default notice, especially considering that Summit never gave the required notice of termination or nonrenewal as per the letter of credit. (Trial Tr. 92:13–15, 233:3–15, 279:11–19, 282:17–23.) Further, GGC previously allowed Southern Season to use a bank without Richmond counters based on LM Retail's acceptance of CertusBank's letter of credit and the drafted lease amendment. (*See* Trial Tr. 34:22–35:2; Trial Ex. 4.) Due to the default notice's explicit requirement of a bank with counters in Richmond, Southern Season did not request that Summit honor the letter of credit.[2] (Trial Tr. 239:15–21.)

---

[2] On April 15, 2016, Southern Season and Summit entered into a Forbearance Agreement. (Trial Ex. 31.) One of the terms of the agreement released Summit from any further obligations to provide a letter of credit or a loan advance. (*Id.* ¶ 6(i).) Thus, Summit would have been unable to honor the letter of credit because of the Forbearance Agreement.

The Southern Season store in Richmond closed on April 24, 2016. (Trial Tr. 60:4–8.) Several days later, on May 3, 2016, Southern Season wired $443,033.67 to Midtown to satisfy the security deposit and avoid defaulting on the lease. (Trial Tr. 67:17–22; 170:12–20; 259:24–260:5; Trial Ex. 41.) Because Southern Season became eligible for a reduction of $106,000, payment of the full $550,000 deposit was not warranted due to the permitted deposit reduction under the lease. (Trial Tr. 33:4–15, 280:1–6; Trial Ex. 1 ¶ 33.) Southern Season attempted to secure another letter of credit from SunTrust in the amount of $550,000 but opted for a cash transfer instead. (Trial Tr. 279:21–280:6.) Even though the transfer was made to Midtown, not LM Retail, the payment was still accepted. (Trial Exs. 20, 41.) The next day, Wilvert confirmed receipt of the $443,033.67 security deposit in an email to Hamner, Jeffrey Gumenick, and Chasen. (Trial Ex. 20.) Jeffrey Gumenick responded with a letter indicating that the transfer satisfied the requirements under the lease and the default was cured. (Trial Ex. 26.) Just two months later, on June 24, 2016, Southern Season filed for bankruptcy, officially ending the business relationship between GGC and Southern Season. (Trial Tr. 74:3–8, 267:12–14; Trial Ex. 23.)

## II.    CONCLUSIONS OF LAW

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. Additionally, personal jurisdiction is present and venue is proper. GGC brings this action under the Virginia common law of fraud, and thus the Court, sitting in diversity, shall apply Virginia substantive law and choice of law rules. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941). The Fourth Circuit has held that "where a cause of action arises in tort, Virginia applies the law of the state where the tortious conduct or injury occurred." *Hitachi*

*Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (citing *Jones v. R.S. Jones &*

*Assocs.*, 431 S.E.2d 33, 34 (Va. 1993)). Here, because the alleged tortious conduct and injury

stem from a real estate transaction in Virginia, the Court must apply Virginia's common law of

fraud.

GGC failed to prove, by clear and convincing evidence, that Hamner committed actual

fraud in the solicitation of an equity investment. GGC's failure to meet its burden on Count I

alleging actual fraud against Hamner is predicated, in part, on GGC's failure to conduct a

prudent investigation into the status of the letter of credit. Accordingly, GGC also failed to show

that either Hamner or Fauver committed constructive fraud in the solicitation of an equity

investment. For the reasons that follow, judgment on Count I and Count II shall be entered in

favor of Defendants.

### A.    Count I: Actual Fraud

In the analysis that follows, the Court notes that it shall evaluate Fauver in addition to

Hamner on elements of GGC's actual fraud claim against Hamner pertaining to reasonable

reliance, false misrepresentation, and materiality. GGC's constructive fraud claim against

Fauver shares these elements with its actual fraud claim against Hamner.

GGC contends that, by failing to disclose that the letter of credit lapsed, Hamner

fraudulently induced GGC into making equity investments into his floundering business. In

Virginia, a party claiming actual fraud "must prove by clear and convincing evidence (1) a false

representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to

mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Thompson v. Bacon*,

425 S.E.2d 512, 514 (Va. 1993). A deliberate or knowing concealment of a material fact may

satisfy the element of misrepresentation. *Van Deusen v. Snead*, 441 S.E.2d 207, 209 (Va. 1994)

("[C]oncealment of a material fact may constitute the element of misrepresentation."); *Spence v. Griffin*, 372 S.E.2d 595, 598–99 (Va. 1988). GGC bears the burden of proving each of the elements by clear and convincing evidence. *Todd v. Sykes*, 33 S.E. 517, 518–19 (Va. 1899). However, circumstantial indicia of fraud may be sufficient to create a presumption of fraud and shift the evidentiary burden to the defendant. *Id.* With these principles in mind, the Court turns to the individual elements of GGC's actual fraud claim.

### i. GGC's Reliance on Defendants' Omission was Unreasonable

GGC, the beneficiary of the letter of credit, failed to conduct a prudent investigation into the letter of credit's status before entering into the Letter Agreement. Therefore, GGC's reliance on the omission of the letter of credit's status was unreasonable.

An essential element of actual fraud is "reliance by the party mislead," in this case, GGC. *See Thompson*, 425 S.E.2d at 514. In Virginia, a plaintiff's reliance on the misrepresentation must be "reasonable and justified." *Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 735 F. Supp. 182, 185–86 (E.D. Va. 1990) (citing *Masche v. Nichols*, 51 S.E.2d 144, 148 (Va. 1949)), *aff'd*, 934 F.2d 319 (4th Cir. 1991). The Fourth Circuit has explained that, "[t]he touchstone of reasonableness is prudent investigation . . ." *Hitachi*, 166 F.3d at 629. When the crucial information is equally available to both parties, the party misled is not typically shielded by the law. *See Horner v. Ahern*, 153 S.E.2d 216, 219 (Va. 1967) (quoting *Costello v. Larsen*, 29 S.E.2d 856, 858 (Va. 1944)) ("'If false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties . . . the law, in general, will leave [the relying party] where he has been placed by his own imprudent confidence.'"). Courts generally require a prudent investigation when information is readily available. *See, e.g., Noell Crane Sys. GmbH v. Noell Crane & Serv.*, 677 F. Supp. 2d 852, 875 (E.D. Va. 2009)

(rejecting a fraud by omission claim where the company failed to search California court records and contact past vendees before waiving indemnity rights to past claims).

In *Noell Crane*, the Court rejected a fraud claim where the defendant did not disclose the existence of a pending lawsuit before entering into a mutual release of claims in a settlement agreement. *Id.* at 858. The Court found that the plaintiff could have discovered the claim by searching court filings or investigating past client records and, therefore, had a duty to do so. *Id.* at 873–75. Because the plaintiff did not conduct this search, its reliance on the defendant's omission of the potential claim was held to be unreasonable, and the fraud claim failed. *Id.*

GGC is similarly situated to the plaintiff in *Noell Crane*. As the beneficiary of the letter of credit, GGC was able to contact CertusBank and Summit to ascertain the status of the letter of credit before entering into the Letter Agreement. (*See* Trial Tr. 86:11–87:18.) Indeed, Southern Season communicated to all investors, including GGC, that Summit bought CertusBank's loan, (*see* Trial Exs. 37, 67), and Wilvert testified that he received the email and read the report. (Trial Tr. 72:2–21.) This disclosure should reasonably prompt a sophisticated business entity, like GGC, to conduct due diligence into the letter of credit's disposition, especially where the letter of credit is a material term of a commercial lease or future equity agreement. If GGC truly considered the letter of credit as material to the lease and the Letter Agreement, as it claims, GGC should have investigated further to see if the letter of credit's status changed with the sale. Despite receiving notice that CertusBank was going out of business and that Summit assumed Southern Season's loan, no one affiliated with GGC investigated the status of the letter of credit until March 29, 2016, months after the parties negotiated and executed the Letter Agreement.

Put simply, the evidence shows that the status of the letter of credit was at hand and as equally available to GGC as it was to Hamner and Fauver, and GGC nonetheless failed to

conduct a reasonably prudent investigation before entering into the Letter Agreement. Virginia common law cannot now shield GGC from its own lack of diligence. Accordingly, the Court finds that GGC's reliance on omissions from Hamner and Fauver was unreasonable under the circumstances. GGC's inability to meet its burden on this element alone warrants judgment for Hamner on Count I.

### ii.      GGC Did Not Prove that Hamner Made a False Representation about the Letter of Credit's Status

The Court finds that additional deficiencies in GGC's actual fraud claim also warrant judgment for Hamner on Count I. Indeed, the Court is not clearly convinced that either Fauver or Hamner made a false representation regarding the status of the letter of credit. A false representation is an incorrect statement that is about a material fact, and not mere opinion. *Tate v. Colony House Builders, Inc.*, 508 S.E.2d 597, 599 (Va. 1999) (quoting *Saxby v. Southern Land Co.*, 63 S.E. 423, 424 (1909)). Further, an unfulfilled promise or a statement as to a future event cannot establish fraud; a false representation must be based on actual and current facts possessed by the party. *Id.* (citing *Patrick v. Summers*, 369 S.E.2d 162, 164 (Va. 1988)). A false representation does not have to be an affirmative statement but can be an omission or concealment. *Spence*, 372 S.E.2d at 599.

In *Tate*, the Supreme Court of Virginia held that the defendant made false statements that contributed to fraud when the defendant's agent sold a house without disclosing severe structural problems. *Tate*, 508 S.E.2d at 600. The court found that the agent's assurances to the buyers that the house was habitable with no major defects were false misrepresentations that sufficiently supported the finding of fraud. *Id.*

GGC has not presented clear and convincing evidence that Hamner or Fauver made an affirmative false misrepresentation about the status of the letter of credit. When discussions

16

about GGC's equity investment in Southern Season began, the letter of credit was still in place. (*See* Trial Tr. 44:10–17, 213:16–20; Trial Exs. 5, 28.) Further, the record does not clearly indicate whether Summit inherited the obligations to honor the letter of credit when it bought the loan. (Trial Tr. 239:15–21; 279:11–19; 282:17–23; 283:22–25.) When Summit bought Southern Season's loan from CertusBank, Hamner and Fauver understood that the only change was to whom Southern Season paid its loan payments. (*See* Trial Tr. 278:6–12.) Southern Season notified all investors, including GGC, about the loan purchase in September 2015, (Trial Tr. 72:2–21; *see* Trial Exs. 37, 67), before GGC and Southern Season executed the Letter Agreement. (*See* Trial Exs. 37, 67.) Unlike the defendant's statements regarding the present condition of the home in *Tate*, Hamner and Fauver did not utter any false statements regarding the status of the letter of credit while negotiating the terms of the Letter Agreement because both sides believed the letter of credit remained in place at the time. (*See id.*)

GGC has not sufficiently established false misrepresentation under a theory of concealment either. Though false misrepresentation can be established through the concealment of a material fact, Virginia courts typically require "either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact." *Norris v. Mitchell*, 495 S.E.2d 809, 812 (Va. 1998) (citing *Van Deusen*, 441 S.E.2d at 209). In addition, "silence does not constitute fraud in the absence of a duty to disclose," *Hitachi*, 166 F.3d at 629 (citing *Norris,* 495 S.E.2d at 812–13, but a duty to disclose generally does not arise amid an arm's length transaction. *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999) (citations omitted). "Most commercial or business relationships do not rise to the level of a confidential or fiduciary relationship when the parties are dealing over an arm's length transaction." 37 Am. Jur. 2d Fraud and Deceit, § 39.

In *Van Deusen*, the Supreme Court of Virginia found that the sellers of a property committed fraud when they failed to disclose major defects in their home to buyers. 441 S.E.2d at 210. As the sellers deliberately concealed major defects in the structure of the house, the court held that the sellers' omission amounted to false misrepresentation. *Id.*

In *Spence*, the Supreme Court of Virginia further held that the petitioner committed fraud by concealing material facts. 372 S.E.2d at 599. There, a preacher and his attorney deliberately concealed to the respondent that he transferred the respondent's donated land directly to himself rather than the church, as intended. *Id.* at 596–99. In the past, the respondent frequently iterated that she intended the land to go directly to the church, even obtaining a receipt from the county clerk's office when recording the deed that demonstrated her intentions. *Id.* at 596–97. Based on this evidence of concealment, the court upheld the lower court's finding of fraud. *Id.*

The Court is not clearly convinced by GGC's evidence that Hamner and Fauver deliberately concealed the status of the letter of credit, as the defendants had as to materials facts at play in *Van Deusen* and *Spence*. *See Van Deusen*, 441 S.E.2d at 209; *Spence*, 372 S.E.2d at 598–99. Instead, Hamner and Fauver informed GGC of what they knew prior to execution of the Letter Agreement. GGC has not sufficiently proven by clear and convincing evidence that Hamner and Fauver's omissions were deliberate, let alone knowing. GGC proffers no contemporaneous evidence that Hamner or Fauver was aware of the alleged lapse of the letter of credit, and instead rests its argument solely on insinuations and conclusory statements about Defendants' intent. These speculative assertions are too unsupported for GGC to meet its high burden of proof. Additionally, Hamner and Fauver lacked a duty to disclose because, against the backdrop of a commercial lease, Southern Season was involved in arm's length negotiations with GGC over an equity investment. The parties to the Letter Agreement were not sufficiently

interrelated to give rise to such a duty. Ultimately, circumstances surrounding Hamner and Fauver's silence on the status of the letter of credit do not satisfy the false misrepresentation element of GGC's actual fraud claim.

### iii. The Letter of Credit Was Not Material to the Letter Agreement

Next, the Court is not clearly convinced that the letter of credit was a material fact to induce the Letter Agreement. A material fact is a fact that "influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." *Packard Norfolk, Inc. v. Miller*, 95 S.E.2d 207, 211–12 (Va. 1956).

In *Packard*, the Supreme Court of Virginia held that a statement made by the defendant's sales representative guaranteeing the car was in "perfect" working condition was material to the plaintiff's decision to purchase the car. *Id.* at 212. Due to the plaintiff's prior history of issues with the defendant's cars, the plaintiff heavily relied on the guarantee that "this was a perfect car" when making his decision. *Id.*

Here, the evidence does not clearly convince the Court that the letter of credit was material to the Letter Agreement.[3] In an email sent to Hamner, Fauver, and Chasen amid negotiations for a lease amendment that was never adopted, Wilvert indicated that in exchange for the amendment and an investment in Southern Season, the letter of credit would need to remain in place. (Trial Ex. 49.) However, this letter of credit requirement was never memorialized in any subsequent agreement nor any proposed terms. Despite GGC's post hoc representations that the letter of credit was material, no such obligation was included in the Letter Agreement. (*See* Trial Tr. 55:10–19; Trial Ex. 16.) The record simply does not present

---

[3] Typically under Virginia law, when there is a written contract, the parties are exclusively bound by the terms of the contract as "the writing contains the whole contract, and is the sole evidence of the agreement." *Erlich v. Hendrick Const. Co.*, 225 S.E.2d 665, 668 (Va. 1976) (quoting *Pulaski Bank Ex'r v. Harrell*, 123 S.E.2d 382, 387 (1962)). However, evidence outside of the contract is admissible where fraud is alleged. *See Shevel's, Inc.-Chesterfield v. Southeastern Associates, Inc.*, 320 S.E.2d 339, 343–44 (Va. 1984).

any clear evidence that the letter of credit was discussed as a term of the Letter Agreement or that the parties believed it to be material to any decision regarding the Letter Agreement. While Southern Season was bound under the lease to maintain the letter of credit, Jeffrey Gumenick, who approved the equity investment, was unaware of any additional terms other than those in the Letter Agreement. (Trial Tr. 361:12–16, 362:8–12; Trial Ex. 1.) Gumenick approved the investment to keep Southern Season afloat and in the rental space. (*See* Trial Tr. 350:7–25, 372:25–373:10.) There is no clear or outspoken guarantee as to the letter of credit's importance to the Letter Agreement's terms, in contrast to the defendant's guarantee in *Packard* about the car being "perfect" to finalize the sale. 95 S.E.2d at 212. Further, the evidence presented does not convince the Court that the letter of credit was material to Gumenick's decision to invest at the time of the Letter Agreement's execution. Accordingly, GGC fails to provide clear and convincing evidence that Hamner's and Fauver's purported omissions were material to the Letter Agreement.

### iv. GGC Failed to Clearly and Convincingly Prove the Omission was Intentional

Though GGC makes conclusory allegations and points to documents from 2016 to assert that Hamner knowingly and intentionally concealed the status of the letter of credit in inducing equity investments from GGC, it has failed to satisfy its burden to prove knowledge and intent by clear and convincing evidence. To demonstrate actual fraud, the plaintiff must provide clear and convincing evidence of a knowing and intentional misrepresentation. *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 581–82 (2003) (citations omitted). Although the plaintiff can establish intent by circumstantial evidence, *Todd*, 33 S.E. at 518–19, "[c]onclusory statements are insufficient . . ." *Noell Crane*, 677 F. Supp. 2d at 872 (citing *Va. Natural Gas Co. v. Hamilton*, 457 S.E.2d 17, 21 (Va. 1995)).

GGC has not produced sufficient evidence of Hamner's knowledge or intent to conceal

the lapse in the letter of credit, particularly at the time leading up to the Letter Agreement when

GGC claims he fraudulently induced them to enter into the contract. GGC's primary evidence

for Hamner's knowledge is retrospective in nature: Southern Season's letter of credit to Summit

regarding an audit is dated March 30, 2016, and a communication where Hamner states the letter

lapsed when CertusBank closed, sent on April 8, 2016. (*See* Trial Exs. 38, 57.) Neither these

exhibits nor the trial testimony sufficiently establish that Hamner knew the letter of credit had

lapsed and intended to conceal this fact to induce GGC to enter into the October 21, 2015 Letter

Agreement. Hamner's April 8, 2016 admission that the letter of credit lapsed was in response to

Paulk's default notice four days earlier. (*See* Trial Ex. 19.) Moreover, the evidence tends to

indicate that Hamner and Fauver operated under the assumption that the entirety of Southern

Season's loan, including the letter of credit, had transferred to Summit after CertusBank sold the

loan. (*See* Trial Tr. 278:6–12.) Wilvert and Chasen made this same assumption when they

decided not to investigate. (Trial Tr. 72:18–21, 87:19–88:12.) GGC's allegations of intent are

conclusory and insufficient to clearly and convincingly establish that Hamner knowingly and

intentionally concealed any lapse in the letter of credit.

As GGC fails to establish numerous elements of its actual fraud claim against Hamner by

clear and convincing evidence, the Court need not delve into whether GGC adequately proved

damages in this matter. In sum, GGC has not shown, by clear and convincing evidence, that its

reliance on Defendants' omissions amounted to a false misrepresentation of material fact or that

GGC reasonably relied on those omissions. As it pertains to Hamner, GGC also fails to offer

sufficient evidence to clearly and convincingly show that Hamner omitted the status of the letter

of credit, at the time before or when the parties executed the Letter Agreement, with knowledge

and intent to mislead. For these several reasons, the Court finds that GGC's actual fraud claim against Hamner fails.

### B.    Count II: Constructive Fraud

GGC also argues that Hamner and Fauver are liable for constructive fraud for failing to disclose the status of the letter of credit while soliciting equity investments from GGC. In Virginia, "[c]onstructive fraud differs [from actual fraud] only in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently; the plaintiff must still prove the other elements of actual fraud -- reliance and detriment -- by clear and convincing evidence." *Hitachi*, 166 F.3d at 628 (citing *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)). Thus, the elements of constructive fraud are (1) a false representation, made innocently or negligently, (2) the misrepresented fact was material, (3) the innocent party suffers damage as a result of reasonable reliance, and (4) the representing party intended to induce the relying party to act on the representation. *Bank of Montreal*, 193 F.3d at 826–27 (quoting *Henderson v. Henderson*, 495 S.E.2d 496, 499 (Va. 1998)).

Count II necessarily fails against both Hamner and Fauver for the reasons stated in Sections A.i and A.iii, *infra*. Specifically, GGC failed to show, by clear and convincing evidence that the status of the letter of credit was material to the Letter Agreement, or that GGC reasonably relied on these omissions when it failed to conduct a prudent investigation into the status of the letter of credit prior to execution of the Letter Agreement. Accordingly, GGC's claims of constructive fraud against Hamner and Fauver fail.

### III.    CONCLUSION

Virginia common law sets a high bar for fraud actions: clear and convincing evidence of each element supporting a claim for actual or constructive fraud. Though the failure of Southern

22

Season's Richmond store is unfortunate, and GGC's 2016 equity investments proved futile, the evidence presented at trial is insufficient to render judgment for GGC on either Count I or Count II. For the reasons set forth herein, judgment shall be entered in favor of Defendants W. Clay Hamner and Brian Fauver and against GGC Associates, LLC on GGC's Amended Complaint (ECF No. 8).

It is so ORDERED.

_____ /s/

Roderick C. Young
United States Magistrate Judge

Richmond, Virginia
Date: August 6, 2018